UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-11357-RGS

NANCY DANIELS

v.

WAL-MART ASSOCIATES, INC., and
GLORIA TAYLOR

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

February 18, 2021

STEARNS, D.J.

In March of 2018, defendant Wal-Mart Associates, Inc. (Walmart) terminated plaintiff Nancy Daniels after issuing her several written warnings regarding her intemperate behavior towards customers and other associates. Daniels contends that defendant Gloria Taylor, a Walmart Human Resources Manager and one of her supervisors, issued her unwarranted discipline, gave her an unfair evaluation, assigned her an untenable work schedule, and refused to accommodate her medical conditions. After being terminated, Daniels, on June 19, 2019, filed this lawsuit. Daniels asserts claims under the Family and Medical Leave Act (FMLA); a failure to accommodate her disabilities (cancer, anxiety, and depression); wrongful termination based on

age and disability discrimination; and retaliation under state and federal law.[1]

Defendants move for summary judgment asserting that Daniels's federal and state discrimination claims "are unfounded" as, early in 2018, the essential working hours of Daniels's training coordinator position were modified to incorporate night and weekend shifts to enable her to train associates who worked those shifts. Further, defendants contend that Daniels "never requested an accommodation that was reasonable," and, notwithstanding, Walmart "complied with its accommodation obligations" by suggesting Daniels apply for a position with a Monday to Friday/ 7 a.m. to 4:00 p.m. schedule. Defs.' Reply at 2.

## BACKGROUND

The relevant facts, viewed in the light most favorable to Daniels as the nonmoving party, are as follows.[2] Daniels joined Walmart on March 19,

---

[1] Specifically, Daniels's Complaint alleges violations of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2615; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112; the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621; and the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B § 1 *et seq*. Counts I through VIII are brought against Walmart. Daniels includes Taylor in Count IX, her Mass. Gen. Laws ch. 151B retaliation claim, and asserts Count X (Chapter 151B coercion, intimidation, and threats) and Count XI (aiding and abetting violations of Chapter 151B) exclusively against Taylor.

[2] Daniels does not dispute or cursorily dismisses most of defendants'

1995, working in the layaway department of its Bellingham, Massachusetts store.  On June 15, 2003, Daniels was promoted to the position of training coordinator.  While she performed intermittent duties as a cashier, site-to-store facilitator,[3] customer service representative, and substitute for vacationing department managers, the focus of Daniels's position (approximately 4/5 of her time), was on hiring,[4] conducting new-hire

ninety-two paragraphs of uncontested facts.  *Compare* Defendants' Statement of Undisputed Material Facts (Defs.' SUMF) (Dkt. # 24), *with* Pl.'s Response to Defs.' SUMF (Pl.'s Resp.) at 3 (Dkt. # 33).  The court will treat the challenged paragraphs as admitted except to the extent they are actually contradicted by a substantive paragraph in Plaintiff's Response which properly cites to supporting evidence in the record.  *See Mehic v. Dana-Farber Cancer Inst., Inc.*, 2018 WL 4189706, at *2-3 (D. Mass. Aug. 31, 2018) (noting that L.R. 56.1 "requires the non-moving party to provide citations to the record, i.e., 'affidavits, depositions, or other documentation,' with page references" to support any contention that there exists a genuine issue of material fact and that the court may "deem admitted the facts in defendants' corresponding L[.]R. 56.1 paragraph when the response paragraph either does not provide an adequate citation to the record or controvert defendant's corresponding L[.]R. 56.1 paragraph.").

[3] "Site-to-store" is Walmart's on-line ordering option through which customers can choose to pick up items at the store to avoid shipping time and charges.  When acting as a site-to-store clerk, Daniels would retrieve the requested item from the inventory and prepare it for customer pick up.

[4] As part of the hiring process, Daniels "reviewed applications, called on reference checks, called associates to book appointments, [and] conducted parts of the interview.  And then called them to – sent them on drug screens, ran background checks on them and would call them for orientation."  Daniels Dep. at 54.

orientations (4 to 8 hours), and training compliance – ensuring that employee and new hire associates completed and abided with training protocols.[5] *See* Daniels Dep. at 42-43; Taylor Dep. at 67-69. Most of the events that underly Daniels's claims happened during the time that she reported to Judy Grayko, the assistant Bellingham store manager, Gloria (Denise) Taylor, the Human Resources manager, and David Rappa, the store manager.[6]

In November of 2014, Daniels was diagnosed with cancer. She had surgery in January of 2015 and, after submitting the requisite medical documentation to Sedgwick Claims Management Services (Sedgwick), she took two weeks of FMLA leave (January 8 to 15, 2015) to recover.[7] Also in

---

[5] Daniels describes the trainings as ongoing – new hires had a battery of trainings; certain Walmart positions required quarterly or annual re-trainings; and employees transferring to new positions also were assigned trainings. Daniels's position also required that she verify all hiring paperwork and ensure that training modules once assigned were completed. Daniels testified that Walmart's policies regarding leaves of absence and accommodations were subjects of the employee trainings. *Id.* at 51-53.

[6] Danielle Croteau was the assistant store manager, and therefore Daniels's direct supervisor, at the time she began her cancer treatments. Judy Grayko became the assistant store manager in April of 2016.

[7] Walmart states that with respect to requests for leaves of absence, "for reasons protected by law" (such as the FMLA), Walmart delegates approvals to Sedgwick as a third-party provider. *See* Defs.' SUMF ¶¶ 6, 7. Daniels contends that Walmart did not follow the same policy with respect to leaves sought under the ADA. *See* Pl.'s Resp. to Defs.' SUMF ¶ 6.

January of 2015, Daniels applied to Sedgwick for "intermittent leave[s] of absence" starting in February of 2015 to undergo radiation treatments. Sedgwick approved both leave requests. Daniels underwent daily radiation treatments for approximately six weeks (February 10 to March 18, 2015). Compl. ¶¶ 25-26. Daniels scheduled her radiation treatments at 3:30 in the afternoon so that she could complete her 7:00 a.m. to 3:00 p.m. shift. She also undertook oral chemotherapy as part of a clinical drug trial, and in May of 2017, was prescribed "a ten-year program of cancer treatment medications." *Id.* ¶¶ 27-28.

### Work Schedule/Reasonable Accommodation

Daniels states that her "cancer condition and necessary treatment seriously impacted her ability to eat, sleep, think, concentrate, walk and work . . . ." *Id.* ¶ 30. "[S]uffering from severe fatigue and a chronic low blood count, [s]he often had brain fog . . . especially in the evenings." *Id.* ¶ 29. Daniels also endured "neuropathy in her extremities, hot flashes, eating difficulties, lowered immune system defenses[,] . . . headaches," and joint aches. *Id.* In addition, Daniels suffered from panic attacks, anxiety, and depression which interfered with her ability to think clearly, focus, and

remember.[8]  Because of the side effects of her treatment, Daniels "informed her supervisors that she could not work nights or weekends . . . and needed two days off in a row to recover from the fatigue working caused [her]."[9]  *Id.* ¶ 34.

Taylor testified that during most of Daniels's tenure as a training coordinator, she functioned as "the personnel coordinator's assistant." Taylor Dep. at 63.  But in 2017, the two positions became more independent.

---

[8] Daniels claims that these conditions were exacerbated by Walmart's mistreatment.  Compl. ¶ 35.  As an example, Daniels states that in the spring of 2015, Taylor approached her with a complaint that had been made to Walmart's Ethics Hotline (a venue for Walmart employees to voice concerns) that store manager Rappa "was treating [Daniels] as a 'favorite' for, among other things, letting her leave at 3 p.m." *Id.* ¶ 36.  Daniels "explained [to Taylor] that she was on intermittent leave of absence for her cancer treatments."[8] *Id.*  Daniels contends that once Taylor was "alerted that [her] disabilities require[d] ongoing accommodation, [Taylor's] treatment of [Daniels] changed drastically for the negative." *Id.* ¶ 44.

[9] Walmart states that it requires all employee requests for accommodations to be submitted to the Accommodations Service Center (ASC) at Walmart's home office (an employee-completed questionnaire along with any supporting medical documentation).  Defs.' SUMF ¶ 4; Taylor Decl. at Ex. 5 (Walmart's Accommodation in Employment (Medical-Related) Policy).  Other than minor modifications (Walmart uses the example of providing a stool for a cashier), Walmart managers are not authorized to grant or deny accommodation requests.  Defs.' SUMF ¶ 5.  When an associate requests an accommodation, the store's personnel coordinator or training coordinator can assist in sending the associate's paperwork to the ASC, "[b]ut with Walmart, . . . the onus is on the employee to file the accommodation with the Accommodation Service Center."  Taylor Dep. at 59.  The same is true of any appeal of the ASC's decision.  *Id.* at 56-57.

The personnel coordinator focused on recruiting, arranging interviews, and enrolling employees for benefits, including "signing up for benefits, . . . open enrollment[,] . . . [and educating employees] on any changes in benefits." *Id.* at 64. The principal duty of the training coordinator "was the onus . . . to do orientations and computer-based learning." *Id.* at 67-68. Taylor stated that the Bellingham store was consistently understaffed, and there was a "big push to hire more part-timers." As most part-timer employees worked evenings or weekends, the work schedule of the training coordinator was altered to add one evening and one weekend shift. Taylor announced the schedule change in a group meeting of personnel and training coordinators.[10] *Id.* at 79. The training coordinators received a handout regarding the schedule change and a "mock evaluation" regarding their new job expectations. *Id.* at 109. The training coordinators also received bulletins regarding the schedule change in Walmart's One Best Way notices (its store operations web site guidelines for employees).

Daniels complains that, while her evaluations had always been completed by a manager in the Bellingham store, in August of 2017, Taylor

---

[10] Taylor added that she gave the training coordinators some time "to change some things around personally to start working the new schedule." Taylor Dep. at 80.

inserted herself into the process.[11]  Taylor testified that she did so as part of a "mock" evaluation designed by regional Human Resources (HR) to enable the training coordinators to "understand . . . exactly what they were tasked to do in [their new] position."  Taylor Dep at 155.  During the evaluation, Taylor reviewed Daniels's accomplishments (94.44% training completion rate; "Nancy is very structured and organized") and offered improvement suggestions ("[s]hould add . . . coaching by walking around"; "[s]hould inform associates of their assessment needs and keep ASM informed of their process"; and "should expand her availability to interact with evening and weekend associates").  Daniels remembers only that Taylor "was pushing the nights and weekend thing."  Daniels Dep. at 142-143, 146-147.  Daniels disagreed that interacting with associates working nights and weekends "was necessary to the function of her job."[12]  However, she testified that "it wasn't

---

[11] Daniels states that she was not due for an evaluation.  Rappa agreed that it was unusual for HR to be involved but that the review was not an annual employee evaluation, but rather an exercise "specifically for the training coordinator."  Rappa Dep. at 92.  Rappa recollected that HR had done similar reviews of other coordinators.  Branchaud testified that, because of the changes in the positions, Taylor did a review of "all the personnel coordinators and all the training coordinators [at] six months."  Branchaud Dep. at 46.

[12] Daniels bases this contention on her insistence that coaching by walking around "was not [her] sole responsibility.  All assistant managers were task[ed] with that as was the store manager and the department managers."  Daniels Dep. at 190.

up to [her] to decide that anyway." *Id.* at 147.  Rappa testified that "there was value in asking training coordinators to work alternate shifts to be available to all associates."  Some associates "wouldn't come in until the evenings or the weekends so . . . their ability to cross paths and train was limited."  Rappa Dep. at 67-68.

For her part, Taylor testified that in August of 2017, Debra Yssa, an HR manager, informed her that, because Walmart was focused on hiring more minors and part-time associates to cover the over-night and weekend shifts, the training coordinators would be required to work at least one evening and weekend shift each week to orient and train these new employees.  *See* Taylor Dep. at 70, 72, 75-76.   HR also asked Taylor "to conduct a special performance assessment of all Training Coordinators in her market."  Defs.' SUMF ¶ 57; Taylor Dep. at 162-163.  Taylor states that during the August 11, 2017 review, she told Daniels that she needed to be available to work "third shift and weekend hours" starting in January of 2018.  Instead of working Monday through Friday, 7:00 a.m. to 4:00 p.m., Daniels would be required to work 11:00 a.m. to 8:00 p.m. on Tuesdays and 7:00 a.m. to 4:00 p.m. on Saturdays, with Thursdays and Sundays off.

When Daniels complained to Grayko about the schedule change, citing her persistent drug-related fatigue, she states that Grayko responded that

"these hours are set in stone.  You have to work these hours if you want this position."  Daniels Dep. at 178.  Nevertheless, between January and March 5, 2018 (with reminders from Daniels), Grayko continued to except Daniels from the new schedule start date.

At some point after the mandated new start date, Taylor "was speaking with Paula [Branchaud] and somehow the conversation came up that [Daniels] was still working 7 to 4."  Taylor Dep. at 80.  Taylor called Rappa to tell him that "the other training coordinators are working the new schedule, and to be fair and consistent."  *Id.* at 80.  Rappa replied that Daniels "was refusing to do it."  *Id.* at 79.  Taylor gave Rappa a deadline for Daniels to begin the new schedule but suggested that, if she did not want to work the new schedule, she should apply for a department manager position.  Rappa responded that Daniels "didn't want to do that."  *Id.* at 81.

Grayko testified that she also suggested to Daniels that she look at other positions at Walmart that did not require night and weekend hours, notifying her that a position was available as the intimate apparel department manager.[13]  Grayko Dep. at 132-133; Daniels Dep. at 201-202.

---

[13] Grayko testified that Daniels was worried that her coaching history would preclude her from the position.  Grayko told her that she "would look into an exception for that because, if she's not going to be able to work what they're asking – because it's a company-wide change, it wasn't a store-wide change."  Grayko Dep. at 132.  Grayko testified that she thought Daniels was

Grayko testified that she also suggested to Daniels that "if she needed an accommodation for something, that she could put in for that."  Grayko Dep. at 133.  Daniels has a different recollection, stating that when she offered to obtain a doctor's note, Grayko told her not to bother asking management for an accommodation with respect to a no nights or weekends schedule because "there's no point because [Taylor's] not going to bend."  Daniels Dep. at 169, 178, 183.  Daniels claims that she repeatedly told management, including Taylor, about her inability to work the new hours (to the point of feeling "bullied"),[14] yet while they would not accommodate her, they accommodated "other associates who had different needs, not even medical ones."[15]  Daniels Dep. at 198.

Daniels admits that she never formally applied for an accommodation

---

"a good fit" as a department manager "because she had the skills already to do that role and it would help her with having two days off in a row, because it's a Monday through Friday, 7 to 4 position."  *Id.* at 134.  Rappa agreed that Daniels would be successful as a department manager.  Rappa Dep. at 65.

[14] Daniels testified that Taylor sometimes was impatient with employees.  Daniels specified two meetings with Taylor, one private and one during a training coordinator meeting, during which she felt Taylor was "angry with her . . . pounced on [her] . . . [and] made [her] feel horrible." Daniels Dep. at 154-157.

[15] The only example Daniels gives involves Casey Flynn, a department manager who is a single mother.  Daniels claims that Flynn's schedule was altered "around what she needed for her kids."  Daniels Dep. at 198-199.

to ASC at Walmart's home office or made any attempt to work the new schedule. Daniels testified that she relied on Grayko's insistence that the new schedule was set in stone despite her managers' knowledge of her medical history.

In January of 2018, Daniels asked to take March 14 to 22, 2018, as personal time off (PTO) in Walmart's Global Time and Attendance System. Daniels told Grayko that her request "was not [for] a vacation and that [she] was going [to Florida] because [her] stepmother had been diagnosed with Alzheimer's and [her] father . . . was trying to deal with it . . . ." Daniels Dep. at 219. Grayko denied the request "because it was too close to inventory." *Id.* at 220. Daniels complained to Rappa. After Rappa upheld Grayko's denial, Daniels noted that an exception based on PTO had been made for Branchaud. Rappa agreed to "look into it and get back to [Daniels]."[16] *Id.* He never did, and the PTO was not approved. Daniels did not apply through

---

[16] Branchaud's brother had been killed by a drunk driver. Walmart granted her leave (the week prior to Daniels's requested week) to travel to Vermont to attend the criminal trial. But Rappa said that generally no one was permitted leave in the weeks prior to inventory (mid-March): "[I]t takes pretty much everyone in the building to get ready for it . . . . There may be day-off requests within that time frame that are honored. But, generally, anything more than a day or two would not be approved." Rappa Dep. at 107-108.

Sedgwick for FMLA leave for the Florida trip.[17]

<u>Discipline and Termination</u>

Daniels's managers testified that they often had issues with her treatment of other store associates and that fellow employees felt bullied by Daniels and had variously complained about her to Grayko, Branchaud, and Rappa. *See* Grayko Dep. at 115-116, 140-145, 151-153, 176-177; Rappa Dep. at 68-69*; see also* Branchaud Dep. at 72-77 ("Jessenia complained . . . Laura, Casey, Tanya, Karen . . . Deb Richards . . . there were other associates and department managers as well. . . . There's quite a few."). Grayko and Rappa each spoke to Daniels about her "behavioral-type issues." Defs.' SUMF ¶ 38.

On January 2, 2017, Elizabeth Jordan, an assistant manager at the Bellingham store, issued Daniels a First Written Coaching after Walmart received a complaint from a customer that Daniels "had been disrespectful to the customer and her mother."[18] *Id.* ¶ 40. According to the citation,

---

[17] When asked if she thought that the time off was appropriate for an FMLA request, Daniels responded, "At the time I didn't believe that it would be." Daniels Dep. at 222.

[18] Walmart has a progressive discipline policy called Coaching for Improvement. For disciplinary infractions, an associate would receive a First Written Coaching followed by a Second and Third Written Coaching if there were reoccurrences. Defs.' SUMF ¶ 8; Taylor Decl. at Ex. 3. Coachings expired if the associate incurs no more than one during any twelve-month period. Rappa testified that, "generally speaking," the employee would be terminated after three written Coachings. Rappa Dep. at 51. While

Daniels had told the customer that it "was not her problem" when the customer asked for assistance. *Id.* ¶ 41. Daniels testified that this happened while she was working site-to-store, and that the Walmart in Walpole had sent the customer and her mother, who were attempting to purchase a birthday present, to Bellingham, where the item was thought to be in stock. Daniels said that she searched exhaustively for the item but was unable to find it and the customer and her mother were very upset. Daniels denies that she was "disrespectful or rude to them."[19] Daniels Dep. at 138. While Daniels disagreed with the Coaching, she did not resort to Walmart's "Open Door"[20] process to object, contending that "[t]he Open Door policy exists on paper, [however] [t]he majority of associates do not believe that it, in effect,

---

acknowledging the policy, Daniels maintains that management "could exercise discretion in whether to issue discipline depending on the incident, [and that] performance or behavior issues could sometimes be open to interpretation." Pl.'s Resp. to SUMF ¶ 8.

[19] Daniels reported that Walmart reviewed a videotape of the confrontation and "you could see that the customers were upset. There was no audio on those videos, so they don't know who said what. So they sided with the customer." Daniels Dep. at 140.

[20] The "Open Door" provides a means for a Walmart employee to appeal a disciplinary action. Walmart does not require that the appeal be made to the manager responsible for the Coaching. The Open Door appeal can be made to anyone in Walmart management. *See* Taylor Decl. at Ex. 1.

works."[21]  Daniels Dep. at 138.

Daniels received a Second Written Coaching on August 7, 2017, from Grayko after Daniels took an associate off a scheduled shift without obtaining management approval.  Defs.' SUMF ¶ 44.  Daniels asserts that it was her prerogative to change associates' schedules – something that she and Branchaud, as training and personnel coordinators, had routinely done (although Branchaud testified that it could be done "[o]nly with management approval").[22]  Daniels Dep. at 162-163; Branchaud Dep. at 88, 89-92.  Grayko expressed her displeasure with Daniels for acting without management approval and admonished her from doing it again.  While Grayko testified

---

[21] Daniels further complained that, "Management always backs each other up, so there's market team, and kind of like hitting your head up against a wall.  It doesn't get you anywhere."  *Id.* at 138-139.  Rappa testified that the Open Door process occasionally resulted in the reversal of disciplinary citations.  Rappa gave an example of Debra Cortez, whose termination was overturned through her Open Door appeal.  Rappa Dep. at 52-53.

[22] Daniels explained that sales associate (Debra Richards) had told her that she was mistakenly assigned an additional Saturday (she was scheduled to work one per month) and asked Daniels to make an adjustment.  Daniels said that she relieved Richards from the shift in response to her complaint and covered it with another associate.  Branchaud testified that Richards's initial leave request had been "denied and [that] she [Richards] went to Nancy and Nancy changed it.  And the manager was upset that it was changed after it was denied."  Branchaud Dep. at 90-91.  When asked how she knew that Richards's request had been denied, Branchaud responded that, "when people put in for a day's off, there's a screen, and you can see.  You can pull up the person's name and see that it was denied."  *Id.* at 92.

that Rappa had told Branchaud and Daniels that their unilateral authority to impose shift changes had been rescinded (Branchaud confirms this); Daniels claims that it was the first she had heard of the new policy.  Daniels Dep. at 164; Branchaud Dep. at 88-89.  Again, Daniels did not appeal the Coaching through the Open Door process.

On November 20, 2017, Daniels received a Third Written Coaching from Grayko, again based on a customer complaint.  Defs.' SUMF ¶ 46.  On this occasion, a customer stated that she had witnessed Daniels "being rude and yelling at a Department Manager who was trying to assist [her]."  *Id*. ¶ 47.  Grayko testified that she warned Daniels about being more respectful with associates and customers.   Daniels testified that at this point, she believed that both Grayko and Rappa "wanted [her] gone," and "they didn't follow company procedure and do an investigation and ask all sides of the story" before writing her up.[23]  Daniels Dep. at 211.  Daniels suffered a panic attack during her meeting with Grayko "because [she] realized now that they were going to fire me, that that's what they were gunning for."  *Id*.  Grayko, however, testified:

[T]hat was not the case.  Nobody wanted to get rid of her.  You

---

[23] Daniels testified that management had a pattern of "get[ting] rid of associates when they want to."  Daniels Dep at 211.  However, when asked for specific instances – e.g., names of managers and associates – Daniels was unable to recall any.  *Id*. at 211-212.

> have to understand, in a store like that where we had so much trouble hiring and she was so knowledgeable and there were so many places that we could utilize her, it was . . . the last thing we wanted to do was get rid of her.

Grayko Dep. at 185.  Grayko also testified that this was the first occasion on which that Daniels revealed that her inflexibility with regard to her personal schedule stemmed from her cancer treatment and the side effects of her chemotherapy.  *Id.* at 210-213.[24]

The boiling point was reached on March 2, 2018, when Walmart associate Laura Vieira approached assistant manager Danielle Croteau and complained about Daniels's behavior towards her and other associates during their respite in the break room.  *See* Vieira Dep. at 57-59.  Croteau asked Vieira and three other associates, Casey Flynn, Tanya Franceschi, and Stephanie Dufault, to provide written statements about the incident.[25]  *Id.* at 60-61; Daniels Dep. Ex. 15.  All four complained that Daniels had been

----

[24] According to Grayko, when she reported this conversation to Rappa, he stated that he was unaware that Daniels was still being treated for cancer. *Id.* at 209.

[25] Taylor testified that it was Walmart's practice to interview complainants and the alleged offender to get all sides of the story – "to have an opportunity to speak."  Taylor Dep. at 105-106.  Daniels testified that Walmart associates Nancy Deragon and Bryce (unknown last name) were in the break room and disagreed with Vieira, Franceschi, Flynn, and Dufault's versions of the events.  Daniels' Dep. at 239, 298.  Daniels, however, has offered no sworn statements to the contrary from these witnesses.

inappropriate and brusque with them during the break.[26]   Rappa testified

---

[26] Flynn wrote in her statement:

> Around 9:30 many associates were in the break room on break when Nancy came in to the break room right up to the table I was sitting at telling associates Laura in Pets, Bryce and Stephanie that they need to go and get their returns or she was going to go to Dave and tell [illegible] . . . positive/professional manner. . . . [it was] extremely rude and unethical considering [illegible] were all in the middle of their breakfast.

Daniels Dep. 232-234, Ex. 15.

Franceschi's statement read:

> Nancy came into break room where we were [illegible] taking our 15-minute break.  She came up to our table and she told Bryce, Laura, and Stephanie that they had to go up and get their returns immediately after break or she would have to tell Dave who didn't go up.  She said Dave told her to report to him who did not go up and they only three that had not gone up.  She seemed angry and said it in a not-so-nice tone.  Kind of rude.

*Id.*

Vieira wrote in her statement:

> During my first break of the day on the breakroom, the -- Nancy came up to me and ordered me to get my [illegible] done, also threatening to tell the store manager if something didn't.  She was extremely rude and not professional. [illegible] She turned her back, not giving time for anyone to answer, also talking over me when I tried.  [illegible] and quite humiliated, considering, again, I was at the break room."

*Id.* 234-235, Ex. 15.  Vieira testified that during this incident, she felt Daniels "was very rude, very disrespectful, completely unprofessional.  Unethical, too, because I was on my break. . . . She was being very stern, like very harsh,

that it was a Walmart policy that associates on break should not be disturbed with work-related matters.  Rappa Dep. at 72, 126-128.  Daniels testified that she knew of no such policy – that she had called people over the intercom multiple times during breaks and all the associates, other than these four, had dutifully retrieved their returns.  Pl.'s Resp. to Walmart's SUMF ¶ 86.

Rappa testified that he had not told Daniels to instruct the four associates to retrieve the returned merchandise during their break.  Rappa then met with Taylor who agreed that discipline was warranted and, because Daniels had already received three behavior-related Coachings during the year, termination was the likely next step. [27]  Grayko was directed to complete

_____

curt. . . .  Not even my mom talks to me like that." Vieira Dep. at 48, 59.

Dufault wrote in her statement:

> While I was on break, Nancy came up to the table rudely and told Laura, Bryce, and I that we needed to get our returns, and if not she said Dave told her she was to inform him on who did not get them, and walked away before I could talk.

 Daniels' Dep. 237, Ex. 15.

[27] Taylor testified that Grayko and Rappa had the discretion to fire Daniels and that she would have as a matter of course followed their recommendation had they chosen not to do so.  Grayko testified that while Daniels's termination was not reflexive, "there's already been a significant amount of incidents that have happened with [Daniels] for the same type of things, it was determined by Dave and Denise that we needed to proceed with a termination."  Grayko Dep. at 194.  Rappa also agreed that, "based on [Daniels's] history and her coachings and . . . the way things played out in the

a termination form.  She and Croteau informed Daniels of her termination on March 5, 2018.[28]  Grayko Dep. 231-232.

Walmart states that any disciplinary decision – including Coachings and terminations – may be submitted for review to any level of management. Defs.' SUMF ¶ 10.  It is undisputed that Daniels did not seek a review. Daniels rather filed a charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD) on November 1, 2018, and then filed this lawsuit on June 19, 2019.

DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving

---

end . . . that there really was no other option.  She had kind of exhausted the coaching process."  *Id*. at 69.

[28] Daniels testified that Branchaud posted Daniels's position internally in February of 2018, prior to her termination.  After discovering the posting, Daniels approached Branchaud, who said that she had posted Daniels's position at management's direction – that Daniels "couldn't/wouldn't work that schedule . . . and that they . . . talked to her about other positions." Branchaud Dep. at 65.  After Daniels was terminated, Alexandra Swarr was hired to fill the position, working one night each week and three Saturdays a month.  Rappa Dep. at 131; Taylor Dep. at 72.  Within the year, the training coordinator position at Walmart was eliminated.  Rappa Dep. at 78.

party's favor." *Petsch-Schmid v. Bos. Edison Co.*, 914 F. Supp. 697, 702 (D. Mass. 1996), citing *NASCO, Inc. v. Pub. Storage, Inc.*, 29 F.3d 28, 32 (1st Cir. 1994). A court evaluating a motion for summary judgment "must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchs. Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983). Summary judgment is appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## Violations of the FMLA - COUNTS I and II

In these counts, Daniels asserts that Walmart interfered with her right to take FMLA leave (and then retaliated against her when she did) by "complaining about her use of leave, discouraging her from taking leave, issuing her unwarranted discipline and removing her from her position." Compl. ¶¶ 79, 85. The FMLA establishes two distinct sets of rights: "prescriptive" rights creating substantive entitlements and "proscriptive" rights providing protection for their exercise. *Colburn v. Parker Hannifin*, 429 F.3d 325, 330 (1st Cir. 2005). Prohibited acts are set out at 29 U.S.C. § 2615. They include both acts of "interference" and acts of "discrimination"

(which at times overlap).  *Colburn*, 429 F.3d at 330.  And while the FMLA "makes no reference to 'retaliation,' [the First Circuit] has recognized such a cause of action in the statute and specifically the interpretive regulation." *Id.*, citing 29 C.F.R. § 825.220(c).

With respect to an interference with substantive rights claim, Daniels need show only an entitlement to leave; no showing of the employer's intent is required.  *Id.* at 331-332.  However, to establish entitlement, she must demonstrate by a preponderance of the evidence that: (1) she was an "eligible employee" under the FMLA; (2) that Walmart is a "covered employer"; (3) that she gave adequate notice of her request for the protected leave; and (4) the leave was necessitated by reasons covered by the Act.  *See Furtado v. Standard Parking Corp.*, 820 F. Supp. 2d 261, 280 (D. Mass. 2011), citing *Goelzer v. Sheboygan Cnty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010).

Walmart asserts that Daniels fails to meet these requirements because she made no request for FMLA leave prior to the expiration of the limitations period.[29]   A Walmart associate is required to submit an FMLA request

---

[29] As a rule, a cause of action arising from an alleged violation of the FMLA must be brought within a two-year statute of limitation, which runs from "the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). When there is an alleged willful violation, "the FMLA limitations period is increased from two years to three." *Hillstrom v. Best W. TLC Hotel*, 354 F.3d 27, 33 (1st Cir. 2003), citing 29 U.S.C. § 2617(c)(2).

through Walmart's third-party administrator Sedgwick.  It is undisputed that Daniels had previously applied for and had been granted two FMLA leaves by Sedgwick.  Daniels admits that she did not request FMLA leave after 2015 and further admits that, at the time, she did not believe that her time-off request to accompany her mother to Florida in 2018 was for an FMLA-covered purpose.   Daniels thus has no actionable claim that Walmart interfered with her FMLA rights.  *See Carrero-Ojeda v. Autoridad de Energia Electrica,* 755 F.3d 711, 722-723 (1st Cir. 2014) ("[T]he FMLA does not protect an employee from discharge for any reason while she is on leave—rather, as we discussed in the retaliation context, it protects her only from discharge because she requests or takes FMLA leave.").

To make out a prima facie FMLA discrimination claim, Daniels must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action. *Hodgens v. Gen. Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir. 1998). As Daniels never applied for FMLA leave in 2018, and the reason she requested vacation was admittedly not FMLA-covered, she did not avail herself of a protected right under the FMLA, and it follows that there can be no retaliation claim. *See Ameen v. Amphenol Printed Circuits,*

*Inc.,* 777 F.3d 63, 70 (1st Cir. 2015) (no retaliation claim where employer was not aware of a request for FMLA leave); *Morris v. Family Dollar Stores of Ohio, Inc.,* 320 Fed. App'x 330, 338 (6th Cir. 2009) (no retaliation claim where there was no FMLA qualifying reason for taking the time off).

## Handicap Discrimination - Counts III and IV under the ADA; Counts VIII and IX under Mass. Gen. Laws ch. 151B, § 4(16) and § 4(4)[30]

Daniels asserts that Walmart knew that she was disabled, refused her an accommodation (not working nights or weekends), and then retaliated against her by "trying to force her to change her schedule, issuing her unwarranted discipline," and then terminating her. Compl. ¶ 101. Under the ADA, an employer is compelled to make reasonable accommodations for known physical or mental limitations of an otherwise qualified individual who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). Walmart does not dispute (for present purposes) that Daniels is disabled. Daniels nonetheless bears the burden of showing: (1)

---

[30] Because the parties do not suggest that the federal and state law claims should be treated differently in any material respect, and because it is the practice of the Massachusetts Supreme Judicial Court "to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. ch. 151B," *Ponte v. Steelcase Inc.,* 741 F.3d 310, 319 n.9 (1st Cir. 2014), quoting *Wheatley v. Am. Tel. & Tel. Co.,* 418 Mass. 394, 397 (1994), the court will analyze the state and federal claims together.

that her requested accommodation was reasonable (even at the summary judgment stage, *see Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 128 (1st Cir. 2017)); (2) "that she possesses the requisite skill, experience, education and other job-related requirements for [her] position"; and (3) "that she is able to perform the essential functions of the position with or without reasonable accommodation." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006). "To satisfy that burden, 'a plaintiff needs to show not only that (1) the proposed accommodation would enable her to perform the essential functions of her job, but also that, (2) at least on the face of things, it is feasible for the employer under the circumstances.'" *Id.* at 127, citing *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (additional citations omitted).

With regard to notice, Daniels argues both sides of the coin: first, that all of her managers knew that she required an accommodation regarding her schedule so that a formal accommodation request would have been redundant; and second, that an application would have been futile because Grayko told her that the redefinition of the training coordinator position had "set in stone" the requirement that she work an evening and weekend shift. "For an employee's actions to constitute a request for accommodation, they must make the employer aware that the employee is entitled to and needs

accommodation." *Miceli v. JetBlue Airways Corp.*, 914 F.3d 73, 82 (1st Cir. 2019), quoting *Ocean Spray Cranberries, Inc. v. MCAD*, 441 Mass. 632, 649 n.21 (2004).   Companies the size of Walmart are permitted to require "specific avenues for relaying requests for accommodations," a protection for both the employee and the employer.   *See Miceli*, 914 F.3d at 82-83.   A company may also insist that its procedure be followed.   *See Vitti v. Macy's Inc.*, 758 Fed. App'x 153, 157-158 (2d Cir. 2018) (plaintiff failed to establish a denial of a reasonable accommodation because she never completed Macy's requisite paperwork requesting one).

Daniels did complete the proper documentation requesting two weeks of FMLA leave in January of 2015 to recover from her cancer surgery, as well as a second application for an "intermittent leave of absence" to undergo radiation treatments from February 10 to March 18, 2015.   Compl. ¶¶ 25-26. Walmart (Sedgwick) granted the FMLA leave requests, but Daniels never applied for an ADA accommodation regarding her work schedule.   Daniels argues that Grayko and Rappa knew that she experienced fatigue from cancer treatment and that Grayko had witnessed her experiencing a panic attack (which Grayko reported to Rappa and Taylor).[31]   But Daniels also

---

[31] Daniels alleges that she informed her supervisors that she could not work nights or weekends and needed two consecutive days off as an "accommodation for her cancer symptoms and treatments."   Compl. ¶ 33.

knew (by virtue of her role as a training coordinator and as a result of her own employee training) that her immediate managers did not have the authority to approve an accommodation and that only a formal request with supporting medical documentation submitted to the ASC could achieve that result.

Daniels also fails to offer evidence that she can perform the job of training coordinator with the accommodation she sought – that is, a 7:00 a.m. to 4:00 p.m., no weekends, work schedule.  Walmart and Taylor provide ample evidence that an essential element of the revised training coordinator position was to work an evening and weekend shift to train employees who only worked those shifts.  *See Sepúlveda-Vargas v. Caribbean Rests., LLC,* 888 F.3d 549, 553 (1st Cir. 2018) (working prescribed shifts was an essential

---

When she made this disclosure is a matter of dispute.  Both Grayko (who began working at Bellingham in April of 2016) and Rappa testified that they were unaware that Daniels was undergoing cancer treatment until January of 2018, when Daniels told Grayko in a meeting in that she was unable to work the new training coordinator schedule because she was "tired from the medication . . . that she was still taking medication for [cancer]."  Grayko Dep. at 210-211 ("I wasn't aware until then that there was even a cancer issue going on.").  Grayko testified that she told Rappa and "he was flabbergasted because he had no idea that it was a current thing; he only knew about it in the past." *Id.* at 213.  The dispute, however, is not material as neither Grayko nor Rappa had the authority to grant Daniels FMLA leave or a job accommodation.

.

function of the job); *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998) (working night shifts held to be an essential function).  Taylor testified that all training coordinators without exception were required to work evening and weekend hours.[32]  While Daniels asserts that Branchaud (a personnel coordinator) was not required to work a night and weekend shift and that Walmart accommodated Casey Flynn (a department manager) by giving her work a schedule compatible with her childcare responsibilities, neither Branchaud nor Flynn was a training coordinator with job responsibilities comparable to Daniels.

Even if Daniels could show that she had requested a reasonable accommodation, once Grayko learned about Daniels's ongoing cancer treatment, she suggested that she transfer to a department manager's position where she could largely keep her desired hours and where there would be less interaction with associates (even alerting her to an opening in intimate apparel).  *See EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) ("The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that

---

[32] Swarr, the employee hired to fill Daniels's position, worked one night each week and three Saturdays a month.  Rappa Dep. at 131; Taylor Dep. at 72.

might address those issues."). Despite Grayko's suggestion, Daniels never formally applied for a department manager position prior to her termination. *Cf. Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 91 (1st Cir. 2012) (affirming summary judgment on an accommodation claim because "the employer did raise the possibility of offering [employee] a transfer to another open position, but [employee] declined to pursue that option").

Daniels asserts that Walmart's change in her work schedule, the disciplinary coachings, and her termination were all taken in retaliation for her requesting ADA accommodation. To establish a prima facie case of retaliation, a plaintiff must "show that (1) she undertook protected conduct; (2) she suffered an adverse employment action; and (3) the two were causally linked." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 28 (1st Cir. 2017), quoting *Noviello v. City of Bos.*, 398 F.3d 76, 88, (1st Cir. 2005). Because Daniels never did request an accommodation, the retaliation claim falls under its own weight. An employer can hardly retaliate for something that never occurred. Because Daniels did not engage in protected conduct, she cannot establish a prima facie case of retaliation.

Assuming for the sake of argument, as Walmart apparently does, that a prima facie case could be shown, under the familiar burden-shifting formula, Walmart is required to come forward with evidence to "rebut the

presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment] decision." *Id.* If Walmart proffers a legitimate, nondiscriminatory reason for its action, "the burden of production shifts back to the plaintiff employee, requiring the employee to provide evidence that 'the employer's articulated justification [for the termination] is not true but a pretext.'" *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016) (footnote omitted), quoting *Blare*, 419 Mass. at 443. "In other words, a plaintiff must show that the adverse action would not have occurred in the absence of the protected activity." *Soni v. Wespiser*, 404 F. Supp. 3d 323, 332 (D. Mass. 2019). In addition, "[t]o defeat summary judgment in a retaliation case, 'a plaintiff must point to some evidence of retaliation by a pertinent decisionmaker.'" *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012), quoting *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997).

In its justification of Daniels's termination, Walmart points to the following. When Walmart associate Vieira approached assistant manager Danielle Croteau on March 2, 2018, and complained about Daniels's behavior in the break room, Daniels had accumulated three instances of formalized discipline (Coachings) in the prior 13 months. Croteau directed Vieira to provide a written statement – three other associates provided

corroborating statements reporting that Daniels had been "extremely rude", "angry," and "not professional." *See supra* n.26.  Vieira wrote that she felt "exposed and quite humiliated." *Id.*   Under Walmart's established and consistent personnel policy, the next progressive disciplinary step was termination.[33]  Rappa testified that "based on [Daniels's] history and her coachings and . . . the way things played out in the end . . . there really was no other option.  She had kind of exhausted the coaching process."  Rappa Dep. at 69.

As evidence that Walmart's justification for her termination was a pretext for discrimination, Daniels counters that the break room incident did not occur as the four associates reported (that they "were friends . . . and possibly biased").  Pl.'s Counterstatement of Undisputed Material Facts (CUMF) at 31 [Dkt #33].  She complains that neither Croteau, in reporting the incident to Rappa, nor Rappa, after reviewing the associates' statements, asked her for her version of the events.  Instead Rappa allegedly directed Grayko to draft the termination forms.  But Daniels must do more than "merely to impugn the veracity of [Walmart's] justification." *Ray v. Ropes &*

---

[33] Branchaud was asked, "Did you ever see any exceptions being made to the rule that, you know, there's three coachings and then termination?" She responded, "No, that's how the system worked."  Branchaud Dep. at 54.

*Gray LLP,* 799 F.3d 99, 113 (1st Cir. 2015), quoting *Azimi v. Jordan's Meats, Inc.,* 456 F.3d 228, 246 (1st Cir. 2006).   "[T]he employer's desire to retaliate against the employee must be shown to be a determinative factor in its decision to take adverse action." *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707 (2011).  The associates' complaints were consistent with Daniels's reputation at the Bellingham store,[34] her prior behavior towards other associates, and her prior disciplinary record.  Nothing in the law required Walmart to reject the associates' statements and choose Daniels's version of the events over theirs.  *See Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 70 (1st Cir. 2008) ("[I]t is the decisionmaker's reasonable belief that guides the inquiry, not whether the employee was or was not guilty of the suspected misconduct."); *Bennett v. St. Gobain Corp.,* 507 F.3d 23, 31-32 (1st Cir. 2008) (same); *Dorman v. Norton Co.*, 64 Mass. App. Ct. 1, 9 (2005) ("[T]here is no evidence here that the defendants discharged the plaintiff on the basis of a report that they knew to be false.").[35]

---

[34] There is ample evidence of Daniels's discourteous and at times intemperate work behavior.  *See* Grayko Dep. at 115-116, 140-145, 151-153, 176-177; Rappa Dep. at 68-69*; see also* Branchaud Dep. at 72-77 ("Jessenia complained . . . Laura, Casey, Tanya, Karen . . . Deb Richards . . . there were other associates and department managers as well. . . . There's quite a few."); Viera Dep. at 40-42.  Grayko and Rappa each had informally spoken to Daniels regarding her "behavioral-type issues."  Defs.' SUMF ¶ 38.

[35] "[C]ourts, in employment discrimination cases, may not act as 'super

## Age Discrimination - Counts V and VI - under the ADEA; Count VII and IX - under Mass. Gen. Laws ch. 151B, § 4(1B) and § 4(4)

In Counts V and VI, Daniels asserts that Walmart treated her differently than other similarly situated employees and then retaliated against her because of her age (58).[36]  Similar to her ADA retaliation claims, Daniels asserts that the retaliation came in the form of "changing her schedule, harassing her, issuing her unwarranted discipline and terminating her employment."  Compl. ¶ 121.  In a wrongful termination case under the ADEA, the plaintiff must establish "that h[er] years were the determinative factor in h[er] discharge, that is, that [s]he would not have been fired but for h[er] age." *Greenberg v. Union Camp Corp.*, 48 F.3d 22, 26 (1st Cir. 1995);

---

personnel departments,' substituting their judicial judgments for the business judgments of employers." *Bennett*, 507 F.3d at 32; *see Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 57 (2005) (same). "In the absence of any evidence that an employer's decision was pretextual or motivated by discriminatory intent, a court has no right to supersede that decision." *Bennett*, 507 F.3d at 32.

[36] Daniels filed her charge of discrimination "on or about November 1, 2018," *see* Compl. ¶ 11, therefore the limitations period for her discrimination claims is 300 days previous, that is, January 5, 2018. *See Kuznarowis v. Tobey Hosp.,* 320 F. Supp. 3d 307, 311 (D. Mass. 2018). Similar incidents may be considered as "background evidence" if the prior actions are of "the same type of discriminatory act or practice *[that] has been timely challenged.*" *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 76 (1st Cir. 2004) (emphasis added), citing *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977).

*see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

Under the *McDonnell Douglas* framework, which has been adapted for analyzing cases under the ADEA, a plaintiff must establish a *prima facie* case by showing that (1) she was over 40 years of age, (2) she suffered an adverse job action, (3) her job responsibilities were assumed by another person, demonstrating the employer's continuing need for an individual of the plaintiff's skills, and (4) she was qualified for the position that she held and was performing well enough to rule out the possibility that the adverse job action was for inadequate job performance. *Keisling v. Ser-Jobs for Progress, Inc.*, 19 F.3d 755, 760 (1st Cir. 1994).

Again, for purposes of this motion, Walmart does not contest that Daniels could establish a prima facie case of discrimination. Nonetheless, "to avoid summary judgment [Daniels] must raise a genuine issue of material fact that . . . (1) [Walmart's] articulated reasons for its adverse actions were pretextual, and (2) the real reason for the employer's actions was discriminatory animus." *Ropes & Gray,* 799 F.3d at 113; *see also Sullivan,* 444 Mass. at 54-55 (plaintiff's burden "to establish that the basis of [employer's] decision was unlawful discrimination by adducing evidence that the reasons given by [employer] for its actions were mere pretexts to hide such discrimination"). Taylor, it should be noted, was older than

Daniels when the decision was made to terminate her.  *See Fairchild v. Forma Sci., Inc.*, 147 F.3d 567, 572 (7th Cir. 1998) ("[T]hat the decision maker is older than the terminated employee is certainly significant in evaluating the evidence of discrimination.").  While the woman hired to take Daniels's place was younger, she was required to work evening and weekend shifts as an essential component of the job.  There is no doubt that Walmart's stated reasons for Daniels's termination, that is, her disciplinary record and her refusal to work the changes in schedule, satisfy Walmart's relatively light burden at the second *McDonnell Douglas* step.

As a result, Daniels must demonstrate that her age was the true reason for the adverse job actions (a schedule change and termination).  Daniels claims that "Judy Grayko and Elizabeth, Assistant Manager stated in front of her that Walmart tries to get rid of older people."  Pl.'s CUMF ¶ 98.  *But see Fontaine v. Ebtec Corp.*, 415 Mass. 309, 314 n.7 (1993) ("[I]solated or ambiguous remarks, tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent."); *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 450 (1996) (same).  Daniels also points to Walmart's subsequent discharge of Rappa at age 50 and its failure to hire Branchaud for its People Lead position, choosing instead a woman in her twenties (both events occurred after the filing of

35

Daniels's Complaint).   Rappa, however, testified that Walmart terminated him because of his inability to staff the store "and as a result, operations suffered.  So that became [his] fault."  Rappa Dep. at 33.  Branchaud testified that Rappa told her that "they wanted somebody that Walmart could train [into] Walmart.  You have to work for Walmart to understand that.  They wanted somebody, an outsider, with no preconceived notions or ideas . . . ." Branchaud Dep. at 41.   Daniels finally cites Taylor's testimony that she was aware of three age discrimination claims filed with the MCAD against Walmart during her ten years in HR (Taylor was typically the HR manager for 11, but at times as many as 31 stores).  Taylor Dep. at 14, 44-46; *see Goldstein v. Brigham & Women's Faulkner Hosp., Inc.,* 80 F. Supp. 3d 317, 330 (D. Mass. 2015), quoting *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 20 (1st Cir. 1999) ("Where the plaintiff bears the burden of presenting similarly situated employees as comparators, and where the defendant has challenged that comparison with credible facts, the plaintiff must demonstrate that 'plaintiff's case and the comparison cases . . . closely resemble one another in relevant facts and circumstances.'"); *see also Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 131 n.6 (1997), quoting *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994) ("The plaintiff does not carry [her] burden of demonstrating pretext on a motion

for summary judgment where [she] provides merely 'sketchy evidence lacking a sufficient foundation for a legally relevant comparison' of allegedly similarly situated employees."). Here, Daniels offers no evidence that would permit any comparative analysis between these asserted instances of age discrimination and her termination. In sum, "[t]he employer's reasons need not be wise, so long as they are not discriminatory, and they are not a pretext." *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 794 F. Supp. 2d 285, 292 (D. Mass. 2011), *aff'd*, 693 F.3d 31 (1st Cir. 2012), quoting *Tardanico v. Aetna Life & Cas. Co.*, 41 Mass. App. Ct. 443, 448 (1996). At bottom, there is no material evidence to support Daniels's age-discrimination claim.

## Coercion, Intimidation, Interference and Threats - COUNT X v. Taylor - Violation of Mass. Gen. Laws ch. 151B, § 4(4A)

The Massachusetts Civil Rights Act (MCRA) reaches private conduct and authorizes a private civil action against any person or persons, whether or not acting under color of law, engaged in the violation of another's rights by means of threats, intimidation, or coercion. *See Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011). Under Mass. Gen. Laws ch. 151B, § 4(4A), it is unlawful "for any person to coerce, intimidate, threaten or interfere with another person in the exercise or enjoyment of any right granted or protected by [chapter 151B]." "Among the rights protected by Gen. Laws ch. 151B is the

right to be free from discrimination in the terms, conditions, and privileges of employment." *Lopez v. Com.*, 463 Mass. 696, 707 (2012).

Taylor maintains, and the court agrees, that "[t]here is no underlying independent actionable right created by the Massachusetts Civil Rights Act" because no facts are alleged that would satisfy the necessary element of "threats, intimidation or coercion." Therefore, a claim against Taylor cannot lie. *See Mouradian v. Gen. Elec. Co.,* 23 Mass. App. Ct. 538, 543 (1987).

## COUNT XI – Violation of Mass. Gen. Laws ch. 151B, § 4(5) Aiding and Abetting v. Taylor

Daniels claims that Taylor "aided, abetted, incited, compelled or coerced the doing of acts forbidden under M.G.L. c. 151B." Compl. ¶ 158. Likewise, aiding and abetting requires the individual defendant committed "(1) a wholly individual and distinct wrong . . . . separate and distinct from the claim in main"; (2) that she "shared an intent to discriminate not unlike that of the alleged principal offender"; and (3) that she "knew of his or her supporting role in an enterprise designed to deprive [Plaintiff] of a right guaranteed him or her under G.L. c. 151B." *Lopez*, 463 Mass. at 713. An aiding and abetting claim under § 4(5) is "entirely derivative" of an underlying discrimination claim. *Id.* As the court has found no evidence to support Daniels's federal and state claims of discrimination or violation of the FMLA, a claim for aiding and abetting also fails.

ORDER

For the foregoing reasons, defendants' motion for summary judgment is <u>ALLOWED</u>.  The Clerk will enter judgment for defendants on all counts and close the case.

SO ORDERED.

<u>/s/ Richard G. Stearns</u>
UNITED STATES DISTRICT JUDGE